COURTENAY COMMUNICATIONS
CORPORATION, Plaintiff–
Appellant,

v.

Patricia HALL and Hallmark Capital
Corp., Defendants–Appellees.

Docket No. 01–9056.

United States Court of Appeals,
Second Circuit.

Argued: April 22, 2002.

Decided: June 24, 2003.

Alfred Ferrer, III, Eaton & Van Winkle, New York, NY, for Plaintiff–Appellant.

Jeffrey W. Herrmann, Vedder Price Kaufman & Kammholz, New York, NY, for Defendants–Appellees.

Before: McLAUGHLIN, F.I. PARKER, SOTOMAYOR, Circuit Judges.

F.I. PARKER, Circuit Judge.

Plaintiff-appellant, Courtenay Communications Corporation ("CCC") appeals from the June 9, 2001 judgment of the United States District Court for the Southern District of New York (Lawrence M. McKenna, *Judge*), granting the motion of defendants-appellees, Patricia M. Hall and Hallmark Capital Corporation (collectively, "Hall") to dismiss CCC's complaint which alleged various violations of the Lanham Act § 43(a), 15 U.S.C. § 1125(a), and state law claims of libel per se, breach of fiduciary duty and conversion. *See Courtenay Communications Corp. v. Hall,* No. 01 CIV. 2228(LMM), 2001 WL 669258, at *1 (S.D.N.Y. June 14, 2001). In dismissing CCC's Lanham Act claim, the court relied entirely on its conclusion that CCC's composite mark, which consists of the words "iMarketing News" and various design elements, was generic and not entitled to trademark protection. The court then declined to exercise supplemental jurisdiction over CCC's state law claims and dismissed CCC's complaint. We hold that the district court erred in its trademark analysis, which was improperly based on premature fact-finding. The judgment of the district court is VACATED and REMANDED for further proceedings consistent with this opinion.

## I. BACKGROUND

We assume familiarity with the district court decision dismissing CCC's complaint, and denying CCC a preliminary injunction and a temporary restraining order against Hall. The court concluded that CCC's mark was generic and thus not entitled to any trademark protection. On the basis of this determination, the district court dismissed the lawsuit and denied the injunctive relief sought by CCC.

CCC's mark is comprised of the words "iMarketing News" with the following graphic features: the "i" is red, lowercase and the same size as the other letters; "MARKETING NEWS" is in small caps;

and there is a yellow circle superimposed over the red "i" and part of the "M" in "Marketing News."

In support of its Lanham Act trademark claim, CCC made, *inter alia,* the following allegations in its complaint:

28. Plaintiff established "iMarketing News" as a trademark for its product.

29. Defendants have a website, www.hallmarkcapital.com, that advertises the services of Ms. Hall and Hallmark Capital.

30. [D]efendants have displayed ... — under the title "What's New"—the mark of "iMarketing News" without the permission of Plaintiff and in a manner that is likely to cause confusion, mistake or deception among persons using ordinary care and prudence in the purchase of defendants' services.

31. In a letter dated February 21, 2001, Plaintiff wrote to defendants and demanded that they remove, inter alia, Plaintiff's trademark from [the website]. Defendants [did not comply.]

32. On defendants' website, a hyperlink under the words "smartest strategic move" in the text beside the "iMarketing News" mark links to another page entitled "Success Stories" and to a paragraph that, because of the association created by the link, describes Plaintiff as "a $15 million privately held direct marketing media company [that] was poorly managed, unfocused and unprepared to take advantage of strategic opportunities. Hallmark Capital provided interim COO services for eight months, overhauling a weak and ineffective corporate infrastructure and creating a strong, dynamic operating environment."

33. Above the paragraph containing the offending statements, a false endorsement purportedly from the "President/Owner" appears stating, "Hallmark Capital gave us the No. 2 executive we had been looking for [sic] years and could never find. Thanks for making this a better place—and us better managers." The President/Owner of Plaintiff never authorized the defendants to use any such statement as an endorsement, and [sic] such President/Owner and Plaintiff consider the services provided by Hall to be unsatisfactory, as evidenced by Plaintiff's termination of Hall.

. . . .

35. The use of the trademark "iMarketing News" or any colorable imitation thereof by defendants is likely to cause confusion, mistake or deception as to the affiliation, connection, association or sponsorship of the services of [defendants] and iMarketing News and/or Plaintiff, and it is believed that it has already caused actual mistake, confusion or deception of the general public.

36. The use of the trademark "iMarketing News" by [defendants] constitutes a knowing and willful false representation concerning the endorsement of their services.

37. These acts of false endorsement by [defendants] have caused and are continuing to cause irreparable injury to the reputation that Plaintiff and iMarketing News have established, and unless the use of iMarketing News by [defendants] is restrained, [defendants] will continue these acts to the detriment of iMarketing News and Plaintiff.

. . . .

39. Plaintiff's trademark "iMarketing News" is the name of Plaintiff's publication of the same name.

40. Defendants, knowing that "iMarketing News" was associated with Plaintiff's publication, sought to take advantage of Plaintiff's trademark and name and engaged in unfair competition by advertising her services on her website by using Plaintiff's trademark.

Compl. ¶¶ 28–33, 35–37, 39–40 [A13–15] Attached to CCC's complaint were printouts from Hall's website that support CCC's allegations.

## II. STANDARD OF REVIEW

We review a district court's decision to grant a motion to dismiss de novo. *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.2003). In considering a motion to dismiss, "we accept all of plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff. We will not affirm the dismissal of a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Desiderio v. Nat. Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999) (quotations and citations omitted). Further, a complaint need only meet the requirements of our "simplified notice pleading standard [which] relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ("When a federal court reviews the sufficiency of a complaint, before the re-

ception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

When presented with a 12(b)(6) motion, the district court may not consider matters outside of the pleadings without converting the motion into a motion for summary judgment. *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir.2000). As this court has noted, "vigorous enforcement of the conversion requirement helps ensure that courts will refrain from engaging in fact-finding when considering a motion to dismiss, and also that plaintiffs are given a fair chance to contest defendants' evidentiary assertions where a court nonetheless does consider evidence extrinsic to the complaint in that context." *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir.1999).

## III. DISCUSSION

The district court based its decision to dismiss CCC's complaint entirely on its conclusion that CCC's mark is not entitled to trademark protection because it is generic. *See Courtenay Communications Corp.*, 2001 WL 669258, at *3; *see also Courtenay Communications Corp. v. Hall*, No. 01 CIV. 2228(LMM), 2001 WL 893863, at *1 (S.D.N.Y. Aug.08, 2001) (denying CCC's motion for reargument, concluding that "the fact that the 'i' in plaintiff's asserted mark ... is printed in red surrounded by a yellow circular shape [is not] sufficient when added to a mundanely generic text in very ordinary typefaces to elevate that mark to protectable status." (footnote omitted)).[1] In so doing, the

---

1. The alternative ground for dismissal raised by Hall, namely that CCC's allegations of false endorsement are insufficient, is without merit. First, the statements on Hall's "Success

Stories" webpage are endorsements; second, on Hall's "What's New" webpage, the hyperlink labeled "smartest strategic move" in the paragraph describing Hallmark's alleged in-

court overlooked two well-established principles when it failed to view the allegations in ·CCC's complaint in a light most favorable to CCC, and engaged in premature fact-finding—thereby depriving CCC of an opportunity to present evidence to support its claims.

A. *The district court failed to view CCC's allegations in a light most favorable to CCC.*

 CCC's complaint alleged, *inter alia,* that CCC "established 'iMarketing News' as a trademark for its product;" that defendants' use of CCC's mark injures "the reputation that Plaintiff and iMarketing News have established;" and

"that 'iMarketing News' was associated with Plaintiff's publication." Compl. ¶¶ 28, 37, 40. Although imprecise, these allegations, viewed in a light most favorable to the plaintiff, are sufficient to allege that the mark is distinctive, either inherently (*e.g.,* if it was found to be suggestive in the minds of the public) or otherwise (*i.e.,* if it was found to be descriptive and to have acquired secondary. meaning), rather than generic (*i.e.,* if it were found to refer to a genus of products rather than a particular producer's product), and therefore protectable under trademark law.[2] Based on CCC's allegations, we cannot agree with the district court's conclusion insofar as it may have presumed that CCC did not sufficiently allege a protectable mark.

volvement with launching iMarket News, is adjacent to the iMarketing News mark, and could support a factual finding that the "trade newspaper publishing parent" (*i.e.,* CCC) made one of the endorsements. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (concluding that the "district court did not err in holding that plaintiff had established a likelihood of confusion within the meaning of the Lanham Act sufficient to entitle it to a preliminary injunction" where "[p]laintiff expects to establish on trial that the public may associate it with defendants' movie and be confused into believing that plaintiff sponsored the movie, provided some of the actors, licensed defendants to use the uniform, or was in some other way connected with the production."); *c.f. Pebble Beach Co. v. Tour 18 I Ltd.,* 155 F.3d 526, 546 (5th Cir.1998) ("[W]here a nominative use of a mark occurs without any implication of affiliation, sponsorship, or endorsement—i.e., a likelihood of confusion—the use 'lies outside the strictures of trademark law,' " *but* "to avail itself of the shield of nominative use, the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) *may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder* ") (emphasis added) (quoting *New Kids on the Block v. News Amer. Publ'g, Inc.,* 971 F.2d 302, 306–09 (9th Cir.1992)). Basically, the hyperlink connection to a page of endorse-

ments "suggests affiliation, sponsorship, or endorsement by" CCC. *See Pebble Beach Co.* at 546.

2. Although CCC has not registered its mark, an unregistered mark is entitled to Lanham Act protection if it would qualify for registration. *See Thompson Med. Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 215–16 (2d Cir.1985). To qualify for registration, "a mark must be capable of distinguishing the applicant's goods from those of others." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (citing 15 U.S.C. § 1052). To qualify for protection, a mark must either be (1) "inherently distinctive" or (2) distinctive by virtue of acquired secondary meaning. *Id.* at 769, 112 S.Ct. 2753.

"In contrast, generic marks ... are not registrable as trademarks." *Id.* at 768, 112 S.Ct. 2753 (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)). A generic term "refers to the genus of which a particular product is a species." *815 Tonawanda St. Corp. v. Fay's Drug Co., Inc.,* 842 F.2d 643, 647 (2d Cir.1988). Essentially, a mark is generic if, in the mind of the purchasing public it does not distinguish products on the basis of source but rather refers to the type of product.

We express no opinion as to whether the mark qualifies for protection.

B. *The district court engaged in premature fact-finding on whether the composite mark as a whole is generic.*

 The district court states in its order dismissing CCC's complaint that it "finds that 'iMarketing' is a generic term." *Courtenay Communications Corp.,* 2001 WL 669258, at *2. Apparently, the district court accepted as fact defendant's claims that the term " 'iMarketing' is widely understood to mean marketing via the internet" and that " 'iMarketing News' 'merely uses the words for the genus of newspapers about internet marketing, or 'imarketing' of which plaintiff's newspaper is one species [and] .... merely defines what plaintiff's newspaper is.' " *Id.* at *2 (citing Defs.' Opp'n at 9). However, it is usually true that "[t]he classification of a mark is a factual question," *Lane Capital Mgm't, Inc. v. Lane Capital Mgm't, Inc.,* 192 F.3d 337, 344 (2d Cir.1999), and that question turns on "how the purchasing public views the mark." *Id.* The pleadings and documents necessarily relied upon by plaintiff's complaint, which were all that the district court could rightfully consider in deciding the motion to dismiss for failure to state a claim, *see Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002), are insufficient for determining the critical fact of how the public views the "iMarketing News" mark.

In support of its conclusion that CCC's mark is generic, the district court relied on *CES Publ'g Corp. v. St. Regis Publ'ns, Inc.,* 531 F.2d 11 (2d Cir.1975). In that case, this Court determined that "Consumer Electronics Monthly" was not a protectable trademark as a matter of law because "consumer electronics" was a generic term

describing electronic equipment. *Id.* at 14. We noted that "it is hard to think of a name for a magazine, directed deliberately and effectively to industry personnel, which more accurately names the class of trade magazines within that industry than one which simply gives itself the name of the trade plus the word 'Monthly.' " *Id.; see also Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976) (following *CES* and discussing use of the generic word "safari"); *Reese Publ'g. Co., Inc. v. Hampton Int'l Communications, Inc.,* 620 F.2d 7 (2d Cir.1980) (following *CES* and finding "Video Buyers Guide" to be generic).

We need not decide, however, whether the district court may take judicial notice of the English language to conclude based on the pleadings that word-only marks in near-standard fonts are generic because they are necessary to describe the product. The district court erred when it did not treat CCC's mark as a composite mark, and we conclude that whether a composite mark, which must be treated as a whole for classification purposes, is generic presents an issue of fact that cannot be resolved on the pleadings. After deciding that the terms used by CCC were generic, the district court concluded as a matter of law that "[b]ecause the Court has found the words that make up plaintiff's mark generic, not descriptive, the addition of the design and typeface elements, regardless of their minimal distinctiveness, could not suffice to make the mark, taken in its entirety, arbitrary, fanciful or suggestive." *Courtenay Communications,* 2001 WL 669258, at *3.[3] On the contrary, even if the words "iMarketing News" are generic, CCC may nonetheless be entitled to trade-

---

**3.** Notably, the cases the court relied on, *CES, Abercrombie & Fitch,* and *Reese* are distinguishable from this case because in all three cases there was no indication that typeface, color, and other design elements were used to

make the composite mark distinctive; rather, in each of those cases the focus was on the plaintiff's ability to control the defendant's use of the words that comprised the plaintiff's mark (*i.e.,* "Consumer Electronics Monthly,"

mark protection for its composite mark as a whole.

■ There are many examples of legally protected marks that combine generic words with distinctive lettering, coloring, or other design elements. *See, e.g., In re Miller Brewing Co.,* 226 U.S.P.Q. 666 (T.T.A.B.1985) (holding that the genericness of the word "LITE" did not render unprotectable Miller's use of the word with distinctive lettering); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560 (Fed.Cir.1987) (logo with generic/descriptive word "SWEATS" beside droplets is a protectable mark); *In re Venturi, Inc.,* 197 U.S.P.Q. 714 (T.T.A.B.1977) (permitting registration of "THE PIPE" where distinctive design elements were employed and the words "The" and "Pipe" were expressly disclaimed). In each of these instances, although the composite trademark owner was not allowed to restrict others' use of the generic elements of the composite mark (*i.e.,* the generic words "lite" or "sweats") the use of the generic words *plus* distinctive elements (*i.e.,* "LITE" displayed in Miller's distinctive lettering), was found to be protectable.[4] As the Trademark Trial and Appeals Board ("TTAB") of the Patent and Trademark Office ("PTO") explained in the context of a composite trademark registration:

[W]e have held that even the distinctive display of descriptive or otherwise unregistrable components of a mark cannot bestow registrability on a mark as a whole unless the features are of such a nature that they would serve to distinguish the mark in its entirety or it can be shown through competent evidence that the unitary mark displayed in the assertedly distinctive manner does in fact create a distinctive commercial impression separate and apart from the descriptive significance of its components.... That is, while an entire mark cannot be disclaimed and also registered, nevertheless, where the unregistrable components of a mark are combined in a design or display which is so distinctive as to create a commercial impression separate and apart from the unregistrable components, it is possible to disclaim those unregistrable components and still have a mark which is registrable as a whole.

*United States Lines, Inc. v. American President Lines, Ltd.,* 219 U.S.P.Q. 1224, 1227 (T.T.A.B.1982).

■ As "[w]e have noted on many occasions ... the decisions of the TTAB, while not binding on courts within this Circuit, are nonetheless 'to be accorded great weight.'" *Buti v. Impressa Perosa*

---

"safari," and "Video Buyers Guide"). *See CES,* 531 F.2d at 12; *Abercrombie & Fitch,* 537 F.2d at 11–12; *Reese,* 620 F.2d at 10–12; *c.f., In re Taylor & Francis (Publishers), Inc.,* 55 U.S.P.Q.2d 1213 (T.T.A.B.2000) (word-logo composite Psychology Press applied to "a series of non-fiction books in the field of psychology" is registerable only if the words "Psychology," "Press," and "Psychology Press" are expressly disclaimed).

4. The district court and Hall both note that in *GMT Prods., L.P. v. Cablevision of New York City, Inc.,* 816 F.Supp. 207 (S.D.N.Y.1993), the court found "The Arabic Channel" to be a generic term. However, CCC points out that the *GMT* court recognized that although the

term alone was generic and not protectable, the plaintiff had successfully registered its composite mark—which combines a graphic design or logo resembling a television camera, upon which is superimposed the letters 'TAC,' followed by the words "THE ARABIC CHANNEL"—on the condition that it include a disclaimer that it does not have an exclusive right to use the words "The Arabic Channel." *See id.* at 209. In other words, GMT owned a valid composite trademark but could not restrict others' use of the generic terms incorporated in the composite mark. The litigation between GMT and Cablevision involved only the use of the words and not the composite mark. *Id.*

*S.R.L.*, 139 F.3d 98, 105 (2d Cir.1998) (quoting *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989)). We are persuaded by the TTAB's reasoning and its explanation of the registrability of composite marks, and apply those principles here. Therefore, because an unregistered mark is entitled to protection if it qualifies for registration, *see supra* note 3, the district court erred as a matter of law when it held that if the words used in CCC's mark are generic, the mark is necessarily unprotectable.[5] Rather, the question of whether or not this composite mark is entitled to protection ultimately turns on whether it, as a whole, is distinctive. *See Lane Capital Management*, 192 F.3d at 346 ("[W]hen the mark at issue is a composite mark ..., the question [in classifying the mark] becomes what the purchasing public would think when confronted with the mark as a whole."); *c.f. Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir.1988) ("The long-standing view that the nongeneric components of a mark must be compared in the context of the overall composite mark, ... remains the rule in this Circuit."). On remand, the district court might determine that the words "iMarketing News" are in fact generic, but nonetheless find that the mark as a whole is distinctive and protectable.[6] Because CCC's mark is unregistered, however, "the burden is on the plaintiff to prove the mark is ... valid," *Reese Publ'g Co., Inc. v. Hampton Int'l Communications Inc.*, 620 F.2d 7, 11 (2d Cir.1980), and to show that the composite mark is not generic.

Viewing CCC's allegations in a light most favorable to CCC, we conclude that CCC's claim should not have been dismissed because (1) determination of the mark's classification—a question of fact—was premature, and (2) the court failed to use the correct legal standards to analyze the composite mark.

## IV. CONCLUSION

For the reasons set forth above, the judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

---

**5.** CCC maintains that its mark has unique design features, such as the use of a red, lowercase "i" inside a yellow circle along with "MARKETING NEWS" (in times new roman "small caps" font), that are analogous to Miller's use of design elements to create a protectable composite mark using "lite." Moreover, it is worth noting that CCC's complaint is focused on Hall's use of a nearly identical composite mark (*i.e.*, words plus allegedly distinctive design elements) and not just the allegedly generic words alone.

**6.** Under such a scenario, should CCC want to register its mark, it might be required to disclaim any generic words, but still would be able to register and otherwise protect the mark as a composite whole. *See, e.g., In re Miller*, 226 U.S.P.Q. at 667.