LOUIS L. STANTON, U.S.D.J.
Plaintiff The Museum of Modern Art ("Museum") moves under Rule 65(a) of the Federal Rules of Civil Procedure for an order preliminarily enjoining Defendants MOMACHA IP LLC and MOMACHA OP LLC (collectively "MOMACHA") from using, displaying, or promoting the MOMA or MOMACHA marks, and the https://momacha.com/ domain name, during the pendency of this action. MOMACHA opposes the motion on the grounds that *369 MoMA has not shown a likelihood of success on the merits of its claims or a likelihood of irreparable harm in the absence of an injunction, and that the balance of hardships tilts in MOMACHA's favor. For the reasons that follow, the motion is granted.
BACKGROUND
The Museum of Modern Art ("Museum") was founded in 1929. Baker Decl. (Dkt. No. 9) ¶ 3. It is located in New York City. Id. ¶9. The Museum has an art collection of approximately 200,000 works of modern and contemporary art, including paintings, sculptures, drawings, prints, photographs, media and performance art works, architecture, and films. Id. ¶ 5. It sustains a library, a conservation laboratory, and archives that are recognized as international centers of research. Id. ¶ 3. The Museum has published more than 2,500 titles, and participates in numerous book fairs each year, including the London Book Fair, Bologna Book Fair, and the Frankfurt Book Fair. Id. ¶ 6.
The Museum offers a range of programs and activities aimed at educating the public about modern and contemporary art. Id. ¶ 5. It offers online courses through Coursera, which currently have over half a million enrolled learners. Id. Many of its programs are offered free or at a low cost. Id. The Museum offers free admission for staff guests, staff from other museums, school tours, children under the age of 16 years, and on Friday afternoons, as well as reduced prices for student and senior admission. Id.
The Museum has over 120,000 individual and family members. Id. ¶ 10. In the four years between 2014 and 2017, it had nearly 12 million visitors, and approximately 2.2 million visitors between July of 2017 and the commencement of this action. Id. Approximately half of its visitors are first-time visitors. Id. The Museum's award-winning website, www.moma.org, had over 13 million unique visitors in the year prior to the commencement of this action. Id. On social media, the Museum currently has over 5.5 million followers on Twitter, 3.4 million followers on Instagram, and 1.96 million followers on Facebook. Id. ¶ 16.
The Museum operates three retail stores in New York City and two in Japan under the name "MoMA Design Store." Id. ¶ 20. One store is located inside the Museum, one is located across the street from the Museum, and one is located downtown in the SoHo neighborhood. Id. The stores sell a wide range of products, including reproductions of artwork displayed in the Museum collection, home items, kitchenware, jewelry, and books. Id.
The Museum, together with its affiliate P.S.1 Contemporary Art Center, now named "MoMA PS1," created the largest platform for contemporary art in the United States and one of the largest in the world. Id. ¶ 7. The Museum also owns "MoMA QNS," a facility in Long Island City, Queens, which operated an art exhibition space between 2002 and 2004. Id. ¶ 9.
The Museum has been generally known by its acronym, MOMA, for nearly 50 years. Id. ¶ 11. That name appears on the Museum's building, banners, signs, brochures, merchandise, promotional materials, and website. Id., Ex. 1. In the mid-1980s, the Museum transitioned its name and logo from "MOMA" to "MoMA," with a lowercase "o" between the two capitalized "M"s. Id. ¶ 12. The Museum's current logo is shown below:
*370 The mark is used both horizontally and vertically, such as on the front of the Museum's building (Id. ¶ 13), as shown below:
The logo uses a proprietary font called "MoMA Gothic," which was developed exclusively for MoMA in 2003 based on the ITC Franklin Gothic font. Id. The logo has received significant press coverage, including in the New York Times. Id., Ex. 2.
The Museum has used the MoMA logo in virtually all of its communications with the public, press, artists, and sponsors, since 1967. Id. ¶ 14. The mark is featured on the Museum's website, signs, brochures, fliers, advertisements, and social media posts about the goods and services MoMA offers. Id. These goods and services include exhibitions, publications, educational programs, and amenities such as restaurants, bars, cafés, and shops. Id. The Museum has offered restaurant and café services inside its museum under the MoMA mark since 1993. Id. ¶ 18. The Museum currently has two cafés, Café 2 and Terrace 5, as well as two restaurants, The Bar Room and The Modern. Id. The MoMA logo is also used by the Museum's licensees on items sold in the MoMA Design Stores, by third-party retailers, and online. Id. ¶ 14, Ex. 3.
The Museum owns the registered trademark for "MOMA" for a variety of goods, such as stationery, arts and crafts, household items, games, artwork reproductions, books, clothing, and other merchandise. Levitt Decl. (Dkt. No. 10) ¶ 3, Ex. A. In addition, the trademark covers museum services, such as conducting exhibitions, workshops, and presentations. Id. The Museum also owns registered trademarks for "MOMA DESIGN STORE," "MOMAQNS," "MOMA MODERN KIDS," and "MOMA PS1" Id. ¶¶ 3-7, Exs. A-E.
MOMACHA operates an art gallery and café that was initially named "MoMaCha." Baker Decl. ¶ 21. MoMaCha opened to the public in early April of 2018 in a storefront space at an art gallery called The Hole, which is located in the Lower East Side of New York City. Id. The café is in close proximity to the MoMA Design Store in the SoHo neighborhood. Id.
MOMACHA displays modern artwork that customers can buy. Id. ¶ 23, Ex. 12. It also sells novelty art-related products such as blankets and towels. Id. MOMACHA has filed trademark applications to register "MOMACHA" and "MOMA" for beverages *371 and restaurant and café services. Levitt Decl. ¶¶ 9-10, Exs. G-H. MOMACHA has a website https://momacha.com that promotes the café, and features photography and artwork. Id. ¶ 22.
MOMACHA's original logo uses a font that is or greatly resembles ITC Franklin Gothic Heavy. Baker Decl. ¶ 29. The logo uses black-and-white coloring, with each of the three syllables in "MoMaCha" on a separate line and the first initial capitalized. Id. ¶ 26. MOMACHA also displays the mark vertically and on one line on its coffee cups. Id. ¶ 27.
On or about April 24, 2018, MOMACHA created a new logo, as shown below. Cahan Decl. (Dkt. No. 19) ¶ 11. The new logo is also in black and white, but uses a different font and capitalizes all of the letters in "MOMACHA." Id. MOMACHA has officially changed its logo to the new logo on its door, menus, cups, employees' clothing, social media accounts, and receipts. Id. MOMACHA has also changed its name from "MoMaCha" to "MOMACHA" on Yelp, Google Maps, its social media accounts, and its hashtag from "#MoMaCha" to "#MOMACHA". Id. MOMACHA now displays disclaimers on its door, its receipts, its website, its social media pages, and a sign inside the café stating that it does not have any affiliation with "the Museum of Modern Art or any Museum." Id.
After creating its new logo, MOMACHA has continued to use its old logo on social media and its coffee cups. Pl.'s Reply Mem. at 4., Levitt Reply Decl. (Dkt. No. 26) ¶ 3, Ex. A. MOMACHA intends to open two or three additional café locations in New York City this year with the same name. Baker Decl. ¶ 25.
DISCUSSION
A party seeking a preliminary injunction must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward *372 the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).
I. Likelihood of Success on the Merits
The Museum argues that it is likely to succeed on the merits of its claims for trademark infringement, unfair competition, and trademark dilution. To succeed on a claim for trademark infringement, a plaintiff "must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark." Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993). To prevail on an unfair competition claim, a plaintiff must also demonstrate a likelihood of consumer confusion between the two marks. Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1048 (2d Cir. 1992). "[T]he elements of a cause of action for New York common law infringement and for unfair competition mirror the requirements of claims stated under the Lanham Act ...." Ritani, LLC v. Aghjayan, 880 F.Supp.2d 425, 448 (S.D.N.Y. 2012). To succeed on a claim for trademark dilution, a plaintiff must "show that its mark is both famous and distinctive." New York Stock Exch., Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 556 (2d Cir. 2002) ; 15 U.S.C. § 1125(c)(1).
MOMACHA argues that (1) the Museum has not shown a likelihood of consumer confusion between the marks, (2) the Museum has not shown that its mark is famous, and (3) the Museum should be denied injunctive relief due to its unclean hands.
Likelihood of Confusion
The parties dispute whether the Museum has shown a likelihood of consumer confusion between MoMA's mark and MOMACHA's mark. In assessing the likelihood of confusion between the parties' marks, the court must first determine whether it should consider MOMACHA's old logo in addition to its new logo.
"While a defendant's 'voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,' it is nonetheless 'an important factor bearing on the question whether a court should exercise its power' to entertain a request for injunctive relief or declare it moot." Holland v. Goord, 758 F.3d 215, 223 (2d Cir. 2014) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982) ). "The voluntary cessation of allegedly illegal activities will usually render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Granite State Outdoor Advertising, Inc. v. Town of Orange, Connecticut, 303 F.3d 450, 451 (2d Cir. 2002) (internal quotation marks omitted). However, "a bare promise by a party in the course of litigation to discontinue past or ongoing misconduct does not justify denial of injunctive relief, since such unilateral action hardly suffices to ensure that the party will not, in the future, reverse course and resume its challenged activities." Lon Tai Shing Co., Ltd. v. Koch + Lowy, No. 90-CV-4464 (DNE), 1991 WL 170734, at *38 (S.D.N.Y. June 20, 1991).
After the Museum filed its motion for a preliminary injunction, MOMACHA claims to have altered the appearance of its mark to eliminate any existing consumer confusion. Cahan Decl. ¶ 11. However, the Museum has presented evidence that MOMACHA has continued to use its original logo in its social media posts and on its beverage cups. Pl.'s Reply Mem. at 4., Levitt Reply Decl. ¶ 3, Ex. A.
*373 Thus, MOMACHA has not completely and irrevocably changed its behavior. There is a reasonable expectation that MOMACHA will continue to use and display its old logo to the public during the pendency of this case, both in its current location and in its new locations that MOMACHA plans to open in the next year. Baker Decl. ¶ 25. MOMACHA may even officially change back to the original logo, which is possible given MOMACHA's co-owner's statement that "it had always been MoMaCha's intention to change its logo on a seasonal basis ...." Levitt Reply Decl. Ex. B. See OBH, Inc. v. Spotlight Magazine, Inc., 86 F.Supp.2d 176, 198 n.8 (W.D.N.Y. 2000) (holding that defendants' voluntary cessation of using plaintiffs' trademark as the domain name for defendants' website after the action was filed could not defeat plaintiffs' motion for preliminary injunction because "there [was] no guarantee that defendants would not simply return to the same conduct if the case [was] dismissed without issuance of an injunction"); cf. Pan American World Airways, Inc. v. Flight 001, Inc., No. 07-CV-14442 (CSH), 2007 WL 2040588, at *6 (S.D.N.Y. July 13, 2007) (denying plaintiff's motion for preliminary injunction because plaintiff did not present "any evidence that defendants are currently selling Pan Am merchandise or using Pan Am marks in their stores or on their website" and did not demonstrate "that defendant [was] likely to resume such uses in the near future"). Because MOMACHA continues to use its old logo, the court should consider MOMACHA's old logo in addition to its new logo when assessing the likelihood of confusion between the two parties' marks.
The factors ordinarily weighed in determining the likelihood of confusion are the familiar Polaroid factors, which include: 1) the strength of the plaintiff's mark; 2) the similarity of plaintiff's and defendant's marks; 3) the competitive proximity of the products; 4) the likelihood that plaintiff will "bridge the gap" and offer a product like defendant's; 5) actual confusion between products; 6) good faith on the defendant's part; 7) the quality of defendant's product; and 8) the sophistication of buyers.
Gruner + Jahr USA Publ'g, 991 F.2d at 1077, citing Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961), "[E]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir. 1986).
1. Strength of the Plaintiff's Mark
The inquiry regarding the strength of the plaintiff's mark "focuses on 'the distinctiveness of the mark, or more precisely, its tendency to identify the goods' as coming from a particular source." Lang v. Retirement Living Publ'g Co., 949 F.2d 576, 581 (2d Cir. 1991), quoting McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1131 (2d Cir. 1979). "[A]n incontestible registered trademark enjoys a conclusive presumption of distinctiveness," but this presumption "extends only so far as the goods or services noted in the registration certificate." Savin Corp. v. Savin Group, 391 F.3d 439, 457 (2d Cir. 2004) (citations omitted).
The Museum owns numerous incontestable registered trademarks for a variety of goods and services, such as stationery, arts and crafts, household items, games, artwork reproductions, books, clothing, other general merchandise, entertainment and art services, and museum services. Levitt Decl. ¶¶ 3-7, Exs. A-E. Therefore, the Museum's mark is presumptively distinctive for these categories of goods and services. The Museum does not, however, own any trademarks specifically covering beverages.
*374 Even without this presumption, the Museum's mark is distinctive. "Courts assess inherent distinctiveness by classifying a mark in one of four categories arranged in increasing order of inherent distinctiveness: (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary." Brennan's, Inc. v. Brennan's Restaurant, LLC, 360 F.3d 125, 131 (2d Cir. 2004), citing Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 744 (2d Cir. 1998) ; Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1508 (2d Cir. 1997). "Generic marks are those consisting of words identifying the relevant category of goods or services." Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 385 (2d Cir. 2005). "Descriptive marks are those consisting of words identifying qualities of the product." Id."Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of 'imagination, thought and perception.' " Id. (quoting Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 118 (2d Cir. 1999) ). "Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." Star Indus., 412 F.3d at 385.
The Museum's mark is descriptive because the acronym "MoMA" stands for "Museum of Modern Art." The mark plainly communicates that MoMA is a museum that displays modern art. See Nature's Bounty, Inc. v. Basic Organics, 432 F.Supp. 546, 552 (E.D.N.Y. 1977) (finding that the acronym "B-100" was descriptive because "the primary purpose and effect of the designation 'B-100' is to denote and describe the ingredients and qualities," namely the Vitamin B product and its potency level); cf. Kadant, Inc. v. Seeley Machine, Inc., 244 F.Supp.2d 19, 28 (N.D.N.Y. 2003) (finding that the acronym "AES," standing for "Albany Engineering Systems," was not descriptive but arbitrary because "AES" had "no logical relationship" to papermaking products, and even someone who knew what the acronym stood for would not be able to ascertain AES's product). The Museum's mark is therefore not arbitrary or fanciful, as the Museum argues, with respect to its display of artwork. The Museum's mark is, however, arbitrary in connection with the Museum's sale of food and beverages, as the acronym "MoMA" does not communicate any information about the Museum's cafés or restaurants.
"If an unregistered mark is deemed descriptive, proof of secondary meaning is required for the mark to be protectible." Thompson Medical Co. v. Pfizer Inc., 753 F.2d 208, 216 (2d Cir. 1985). A mark has secondary meaning if consumers "associate it with a certain producer, and will be likely to make that same association when an identical mark (or a confusingly similar mark), is used on another producer's product." Id. at 215-16. In determining whether a mark has acquired secondary meaning, courts have examined "advertising expenditures, consumer studies linking the name to a source, unsolicited media coverage of the product, attempts to plagiarize the mark, and length and exclusivity of the mark's use." Id. (citations omitted). No single factor is determinative, and not every element must be proven. Id.
The Museum has exclusively used its "MOMA" or "MoMA" mark for a significant length of time-nearly 50 years. Baker Decl. ¶ 11. It has owned some of its registered trademarks since 1967. Id. The Museum advertises and promotes its services under its mark in a variety of print and digital publications, such as The New York Times, The Wall Street Journal, The New Yorker, Art in America, Variety, Hollywood Reporter, WNET, New York Magazine, Vice, and Gothamist. Id. ¶¶ 15-16. The Museum has also received significant *375 media coverage. Id. ¶ 13. For example, a New York Times article, dated September 21, 2003, featured a spread on the Museum and its redesigned logo. Id., Ex. 2. The article included a large image of the logo, underneath which mentioned the proprietary "new MoMA Gothic" font as well as the "Franklin Gothic # 2" font. Id.
Additionally, MOMACHA's use of a font and style highly similar to those of the Museum's mark for its old logo constitutes an attempt to copy the Museum's mark. As a result, some MOMACHA consumers on social media have assumed that MOMACHA is affiliated with the Museum, demonstrating that consumers recognize the Museum's mark and associate similar marks with the Museum. Therefore, the Museum's exclusive use of its mark for a significant length of time, its advertising in numerous publications, its unsolicited press coverage, and MOMACHA's attempt to copy the Museum's mark all support the finding that the mark has acquired secondary meaning in the public mind.
MOMACHA's argument that the Museum's mark is not distinctive because others have adopted similar marks both within and outside the art industry (Defs.' Mem. at 4-6) fails. The Museum of Contemporary Art North Miami's mark "MoCA" and the San Francisco Museum of Modern Art's mark "SFMOMA" not only appear and sound different from the Museum's mark "MoMA," but are also located in different cities. This significantly lessens the likelihood of confusion. MOMACHA, in contrast, is a café and art gallery located in the same city as the Museum, MoMA QNS, MoMA PS1, and the MoMA Design Stores, resulting in a greater likelihood of consumer confusion.
MOMACHA argues that third-party uses of the mark "MOMA" in connection with sales of shoes and wine further demonstrates that the Museum's mark lacks distinctiveness in the market. However, shoes and wine are so remote from the products offered by the Museum and MOMACHA that there is little need for the Museum to attack those uses in order to protect the value of its distinctive mark, and this argument is unpersuasive. See Playboy Enterprises, Inc. v. Chuckleberry Publ'g, Inc., 486 F. Supp. 414, 422-23 (S.D.N.Y. 1980) ("The owner of a mark is not required to police every conceivably related use" of its mark and maintains its right to protect against use of its marks "in areas of direct competition ... most crucial to maintaining its mark's commercial value.").
The Museum's mark is strong and distinctive, and identifies its goods as coming from the Museum. As a result, the use of a similar mark on a product from a different source is likely to confuse consumers into associating the product with the Museum.
2. Similarity of the Parties' Marks
In considering the similarity of the parties' marks, courts look to two questions: "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers." Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 962 (2d Cir. 1996). "In deciding whether the marks are similar as used, we do not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." Id."[M]arks are considered similar when they are similar in appearance, sound and meaning." Clinique Labs., Inc. v. Dep Corp., 945 F.Supp. 547, 552 (S.D.N.Y. 1996).
As previously discussed, the court will consider both MOMACHA's old and new marks when assessing their similarity with the Museum's mark. MOMACHA's original mark is highly similar in appearance to the Museum's mark. It uses the *376 same black and white coloring. It capitalizes both "M"s in its name. It employs a similar bold font resembling Franklin Gothic and the Museum's proprietary font. The image of the overlay of the Museum's proprietary font on top of MOMACHA's old logo demonstrates that the two fonts are almost exactly the same. Baker Decl. ¶ 29. MOMACHA's display of its original logo on coffee cups both horizontally and vertically greatly resembles the Museum's mark and the manner in which it is displayed on the Museum's building. Although the capitalization in "MoMaCha" is slightly different from that of "MoMA"-the "a" in "MoMaCha" is lowercase-the unique alternating capitalization of the first three letters is nonetheless likely to confuse the public, especially if those letters are in the same bold font and in the same black-and-white coloring.
MOMACHA's old mark is presented in the marketplace in a manner that is likely to cause consumer confusion. The names of the Museum's other satellite locations (MoMA Design Stores, MoMA QNS, and MoMA PS1) all begin with the letters "MoMA," followed by certain identifying letters or numbers. They are also all located in New York City. As a result, the public might mistakenly assume that "MoMaCha" is another one of the Museum's satellite locations in New York City due to MOMACHA's unique name and mark. That MOMACHA is a café rather than a large museum is unlikely to dispel confusion, as not all of the Museum's locations are museums or museum-grade facilities, such as the MoMA Design Stores. MOMACHA's old mark is thus highly similar to the Museum's mark both in appearance and in the way it is presented in the marketplace.
MOMACHA's new logo is not highly similar in appearance to the Museum's logo, as the new logo uses a significantly different font, and capitalizes all of the letters in "MOMACHA." The Museum argues that MOMACHA's new logo is still similar because it continues to emphasize each syllable of "MOMACHA" by separating "MO," "MA," and "CHA," into three different lines. Pl.'s Mem. at 6. The Museum argues that the mark is thus merely "MoMA" combined with the added descriptive element "cha," meaning tea in Mandarin. Id. MOMACHA counters that its name is based on the combination of the two words "more" and "matcha," not "MoMA" and "cha." Cahan Decl. ¶ 6. Neither party's argument is compelling, as the mark is not separated into two lines "MOMA" and "CHA," nor is it separated into "MO" and "MACHA." The separation of syllables into three lines alone is insufficient to make a finding that MOMACHA's new logo looks or sounds similar to the Museum's mark.
MOMACHA's new logo still has some similarities to the Museum's marks in appearance, meaning, and as presented in the marketplace, however. First, the dominant features (strong block letters in black-and-white coloring) remain the same. Second, although the change eliminates the "MoM" capitalization similarity, the capitalization of "CHA" creates another similarity with some of the Museum's satellite locations. MoMA QNS and MoMA PS1, for example, both consist of the letters "MoMA" followed by three characters with all of its letters capitalized. It would thus not be unreasonable for someone to believe that "MOMACHA" is another one of the Museum's satellite locations, despite the capitalized "O" and lack of a space between "MOMA" and "CHA."
Overall, MOMACHA's old logo is highly similar in appearance to the Museum's logo, but the new logo is somewhat less so. However, MOMACHA still continues to display its old logo on its cups and social media accounts. Levitt Reply Decl. ¶ 3, Ex.
*377 A. Consumers are thus likely to believe, despite the display of a different logo in most other areas of the café, that MOMACHA is still affiliated with the Museum.
MOMACHA argues that the marks are not confusingly similar in the way that they are presented to the public because MOMACHA now disclaims any affiliation with the Museum at numerous points throughout the customer experience. Cahan Decl. ¶ 11. "The Second Circuit has placed the burden of proving the effectiveness of a disclaimer squarely on the shoulders of the party relying upon it." BIC Corp. v. Far Eastern Source Corp., No. 99-CV-11385 (HB), 2000 WL 1855116, at *6 (S.D.N.Y. Dec. 19, 2000), aff'd, 23 F. App'x 36 (2d Cir. 2001). The Second Circuit has also taken note of academic literature concluding that "disclaimers are frequently not effective," especially those that "employ brief negator words such as 'no' or 'not,' " as MOMACHA's disclaimer does. Home Box Office, Inc. v. Showtime/The Movie Channel Inc., 832 F.2d 1311, 1316 (2d Cir. 1987) ; see BIC Corp., 2000 WL 1855116, at *6 ("Considering the fact that consumers make these purchases quickly ... and that the disclaimer uses only a 'not' to distinguish the brands, it is likely that a consumer might either not see it at all or worse yet be even more keenly confused ....").
Because MOMACHA's old logo is highly similar to the Museum's mark, and the new mark and disclaimers have not been shown to have eliminated consumers' previous confusion, this factor weighs in favor of finding a likelihood of confusion.
3. Competitive Proximity of the Products
"This factor focuses on whether the two products compete with each other." Lang, 949 F.2d at 582. "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." Id. The court may consider "whether the products differ in content, geographic distribution, market position, and audience appeal." W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993).
"To be 'related' for the purposes of trademark law, conflicting goods or services do not have to be in direct competition with one another." New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F.Supp.2d 305, 336 (S.D.N.Y. 2010). "Rather, the relevant question is whether they are so 'related' that a reasonable buyer is likely to think that a defendant's goods or services are somehow connected with or sponsored by the plaintiff, due to similar marks." Id. (citing Herbko Int'l, Inc. v. Kappa Books, Inc., 308 F.3d 1156, 1165-66 (Fed. Cir. 2002) ).
The Museum and MOMACHA are not necessarily in direct competition with each other, as the Museum contains approximately 200,000 works of art, and MOMACHA is a smaller café and gallery. However, both the Museum and MOMACHA display modern artwork and offer café and beverage services in an art gallery setting. They also both sell items in relation to the art they display. Thus, the parties' goods and services are essentially the same in content. The Museum and MOMACHA have the same geographic location and audience appeal as well. They are both located in New York City and draw the same audience of New York tourists and residents who choose to enjoy modern art and relax with a beverage. Social media posts about MOMACHA using the hashtags "#museum," "#gallery," "#newyorkart," and "#modernart" further strengthen the relatedness of services in consumers' minds. Levitt Decl. Exs. J-K.
*378 Published articles about MOMACHA including phrases such as "modern art experience," "art installation," and "[t]he café, whose name is a play on MoMa's, also doubles as a gallery," have the same confusing effect. Baker Decl. ¶ 32, Ex. 16.
MOMACHA's argument that the services provided by the Museum "are completely different" because the Museum sells prints and reproductions of art instead of original artwork (Defs.' Mem. at 12) is unconvincing. Both types of products depict the modern and contemporary art that visitors appreciate inside the Museum and MOMACHA, and both are utilized for the purposes of decoration and visual enjoyment. Furthermore, the goods and services both parties offer need not be identical. See New York City Triathlon, 704 F.Supp.2d at 336 (noting that "[l]ikelihood of confusion has also been found in cases involving 'complementary' goods and services, even though some of these pairs of goods occupy fairly distinct market spaces," such as wine and cheese, or moss and fertilizer). Therefore, the close proximity of the parties' goods and services is likely to result in the belief that MOMACHA is connected with the Museum.
4. Likelihood that Plaintiff Will Bridge the Gap
"This factor is designed to protect the senior user's 'interest in being able to enter a related field at some future time.' " Savin Corp., 391 F.3d at 459-60, quoting W.W.W. Pharm., 984 F.2d at 574.
The Museum has long been occupied in the business of displaying modern art, selling items depicting the art displayed, and furnishing beverages for its customers. Because MOMACHA also displays modern art, sells the artwork it displays, and serves beverages, there is barely any gap for the Museum to bridge. See Star Indus., 412 F.3d at 387 (holding that when "products are already in competitive proximity, there is really no gap to bridge," making this factor "irrelevant to the Polaroid analysis in this case."). This factor does not favor either side.
5. Actual Confusion
"It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 151 (2d Cir. 2003). "We have therefore deemed evidence of actual confusion 'particularly relevant' to the inquiry." Id. (quoting Streetwise Maps, 159 F.3d at 745 ). For purposes of the Lanham Act, actual confusion means "consumer confusion that enables a seller to pass off his goods as the goods of another." W.W.W. Pharm., 984 F.2d at 574 (citation and internal quotation marks omitted). "Evidence of actual confusion may consist of anecdotal or survey evidence." Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F.Supp.2d 305, 319 (S.D.N.Y. 2000) (citing Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1227 (2d Cir. 1987) ). "Although the absence of surveys is evidence that actual confusion cannot be shown ... a trier of fact may still conclude that actual confusion exists in the absence of such evidence, so long as there is other evidence of actual confusion." Sports Auth., 89 F.3d at 964.
Although the Museum has not provided survey evidence, the Museum provides multiple anecdotal instances of actual confusion. Specifically, the Museum cites an email it received from an attorney who thought "the style of the font and the display of the [MoMaCha] name looked so much like the familiar MoMA logo" that he needed to confirm whether MOMACHA was affiliated with the Museum. Levitt Decl. Ex. M. The Museum also points to social media posts by consumers who believed that MOMACHA's beverages are *379 affiliated with the Museum. One such post contained an image of a MOMACHA drink with latte foam art in the shape of MOMACHA's old logo. Id., Ex. K. The post's author included a caption alongside the photo, which stated, "When a museum makes Machas." Id. Another post showed a picture of a MOMACHA drink decorated with latte foam art in the shape of a marijuana leaf. Id., Ex. L. Someone commented on the post, "I haven't been to MoMa in a while! Great excuse." Id. These examples refute MOMACHA's claim that no instance of actual confusion has involved a MOMACHA consumer.
MOMACHA's claim that no confusion has occurred since MOMACHA added disclaimers and changed its logo is incorrect. On May 15, 2018, after MOMACHA made its changes, a MOMACHA customer posted on Yelp, a crowd-sourced review forum, stating that she "thought it was affiliated with the moma." Levitt Reply Decl. ¶ 8, Ex. F. This demonstrates that MOMACHA's changes have not effectively dispelled consumer confusion.
6. Defendant's Good Faith in Adopting the Mark
The good-faith factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang, 949 F.2d at 583 (citation and internal quotation marks omitted).
It is more likely than not that MOMACHA intentionally copied the Museum's mark in bad faith when it adopted its old logo. As discussed above, the marks are strikingly similar and almost identical in terms of the font style, coloring, and capitalization. Baker Decl. ¶¶ 28-29. The social media posts of the designer of MOMACHA's old logo consisting of numerous photos of the Museum and MoMA PS1 exhibits (Levitt Decl. ¶ 16, Ex. N) demonstrate that she frequented the Museum's locations and was aware of the Museum's logo. It thus seems probable that MOMACHA created and adopted its logo with the intent of copying the Museum's mark. See MetLife, Inc. v. Metro. Nat'l Bank, 388 F.Supp.2d 223, 234 (S.D.N.Y. 2005) (finding "circumstantial evidence of bad faith" because "the similarity between the parties' marks is such that it strains credulity to believe that neither MNB nor the firm it hired to redesign its logo were not consciously influenced by the MetLife logo.").
A "request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith." Lang, 949 F.2d at 583 (citing E.S. Originals Inc. v. Stride Rite Corp., 656 F.Supp. 484, 490 (S.D.N.Y. 1987) ). That MOMACHA retained counsel to give advice and conduct a trademark search to ensure that the word mark "MOMACHA" did not conflict with any registered trademarks (Cahan Decl. ¶¶ 3-4) would indicate that MOMACHA acted in good faith, were it not for the fact that in applying to register the word mark "MOMACHA," MOMACHA also applied to register the word mark "MOMA," the exact same mark as that of the Museum. Levitt Decl. ¶ 10, Ex. H.
It may later be rebutted, but on the present record it appears that MOMACHA's similarity to the Museum's mark was not accidental, but purposive.
7. Quality of Defendant's Services
The "quality of goods and services" factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 398 (2d Cir. 1995). This factor is "one of the less probative factors in a determination of likelihood of *380 confusion," as it "goes more to the harm that confusion can cause than it does to the likelihood of confusion itself." New York City Triathlon, 704 F.Supp.2d at 340 (citing Virgin Enters., 335 F.3d at 151 ).
Given the subjective nature of assessing art and beverages, this factor does not weigh in favor of either party.
8. Sophistication of the Purchasers
"Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." Bristol-Myers Squibb, 973 F.2d at 1046. "The greater the value of an article the more careful the typical consumer can be expected to be ...." McGregor-Doniger, 599 F.2d at 1137, superseded by rule on other grounds as stated in Bristol-Myers Squibb, 973 F.2d at 1044.
There are certainly many sophisticated visitors of the Museum and MOMACHA, such as art enthusiasts, historians, collectors, and other artists. However, art museums and galleries attract the general public, including both tourists and residents. The cost of viewing art in galleries and museums is relatively low. The Museum offers reduced prices for students and seniors, free admission on Friday afternoons, free school tours, and free admission for children under the age of 16 years. Baker Decl. ¶ 5. As a result, a significant amount of the Museum's and MOMACHA's visitors are likely to be unsophisticated and unknowledgeable about the art being displayed.
Similarly, the cost of a beverage is relatively low, and an average consumer of tea or coffee is thus unlikely to be discerning when buying a beverage from either party. Assuming that a large share of MOMACHA customers are not art or tea experts but casual viewers interested in enjoying specialty beverages, they may be more vulnerable to associating MOMACHA with the Museum.
This factor weighs in favor of finding a likelihood of confusion.
Weighing the Factors
In weighing the Polaroid factors, no single factor is dispositive. Brennan's, Inc., 360 F.3d at 130. However, the first three factors-strength of the mark, similarity of the marks, and competitive proximity of the goods and services--are "perhaps the most significant in determining the likelihood of confusion." Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987). Taken as a whole, the Polaroid factors weigh in favor of finding a likelihood of confusion.
The Museum has shown that it is likely to succeed on the merits of its trademark infringement and unfair competition claims.
Fame of MoMA's Marks
There are "five necessary elements to a claim of dilution: (1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 215 (2d Cir. 1999). MOMACHA disputes that the Museum has shown a likelihood of success on the first element, that the Museum's mark is famous.
[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
*381 (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
(iii) The extent of actual recognition of the mark.
(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.
15 U.S.C. § 1125 (c) (2) (A).
The Museum has been generally known as MoMA and has used the MoMA trademark for the lengthy period of nearly 50 years. Baker Decl. ¶ 11. The Museum's mark has attained substantial publicity across the country through various means. The mark is featured in the Museum's exhibitions, restaurants, cafés, and shops inside the Museum, which has had nearly 12 million visitors between 2014 and 2017. Id. ¶¶ 10, 14. The Museum displays its mark on its website, which has had over 13 million unique visitors over the past year. Id. ¶ 10. The mark is also displayed on the Museum's Twitter, Instagram, and Facebook social media accounts, which have attained millions of followers. Id. ¶ 16. Additionally, the logo is displayed on the Museum's signs, brochures, communications with the public, as well as merchandise sold in stores, through third-party retailers, and online. Id. ¶ 14.
The Museum uses its mark when advertising and promoting itself in national publications such as The New York Times, The Wall Street Journal, The Art, The New Yorker, Even, Sculpture, Art in America, Artforum International, Variety, and Hollywood Reporter. Id. ¶ 15. In April of 2013, the Museum published a blog post about its mark and proprietary font. Id. ¶ 30, Ex. 15. The mark has also received third-party press coverage, such as the large feature on the Museum's signature font and logo in The New York Times. Id. ¶ 13, Ex. 2.
The Museum offers a significant amount and wide range of goods and services under its mark. Its art collection contains approximately 200,000 works of art. Id. ¶ 5. The Museum offers programs and activities aimed at educating the public about modern and contemporary art. Id. ¶ 5. It offers online courses, which currently have over half a million enrolled students. Id. The Museum's goods and services also reach a large geographic scope, as two of the MoMA Design Stores are in Japan. Id. ¶ 20. Additionally, the Museum participates in numerous book fairs overseas every year, such as London Book Fair, Bologna Book Fair, and Frankfurt Book Fair. Id. ¶ 6.
As a result of the extensive publicity of the Museum's mark and goods and services offered under the mark, the mark has likely obtained actual recognition across New York and the nation. The Museum also owns numerous trademark registrations covering the "MoMA" mark. Levitt Decl. ¶¶ 3-7, Exs. A-E. Accordingly, the Museum has offered sufficient evidence of the fame of its mark, and is likely to succeed on the merits of its trademark dilution claim.
Unclean Hands
To sustain the defense of unclean hands, MOMACHA must show that the Museum has engaged in "inequitable conduct or bad faith where the misconduct has a material relation to the equitable relief that plaintiff seeks." Stokely-Van Camp, Inc. v. Coca-Cola Co., 646 F.Supp.2d 510, 532 (S.D.N.Y. 2009) (citation and internal quotation marks omitted) (finding that plaintiff had unclean hands because it engaged in the same misleading marketing about its beverages that defendant practiced); see also *382 Haagen-Dazs v. Frusen Gladje, 493 F.Supp. 73, 75-76 (S.D.N.Y. 1980) (denying plaintiff's request for a preliminary injunction against defendant for deceptive trade practices because plaintiff was engaged in the same deceptive misconduct).
MOMACHA claims that the Museum has unclean hands because the Museum is pursuing this litigation in bad faith and is a large entity trying to "bully" MOMACHA and cripple MOMACHA's success. Defs.' Mem. at 18-19. MOMACHA does not allege that the Museum has engaged in inequitable conduct that has a material relation to the relief the Museum seeks, such as infringing another entity's trademark or copying someone's logo.
There is no showing that the Museum has unclean hands or has pursued this litigation in bad faith.
II. Irreparable Harm
"Any party seeking a preliminary injunction 'must demonstrate that it will suffer irreparable harm in the absence of the requested relief.' " Sussman v. Crawford, 488 F.3d 136, 140 (2d Cir. 2007), quoting Latino Officers Ass'n v. Safir, 170 F.3d 167, 171 (2d Cir. 1999). Irreparable harm is "harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010).
"Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.' " New York City Triathlon, 704 F.Supp.2d at 343 (quoting Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc., 754 F.2d 91, 92 (2d Cir. 1985) ). "A plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury." Weight Watchers Int'l, Inc. v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005).
The Museum has established that it will suffer irreparable harm if MOMACHA is not enjoined. As previously discussed, MOMACHA's use of its mark creates a likelihood of consumer confusion, which leads to the presumption of irreparable harm. If MOMACHA is not enjoined, consumers will continue to be confused when they see MOMACHA's advertising, press coverage, retail products, and social media accounts, especially because MOMACHA continues to use its old logo.
Even though MOMACHA's goods and services are not necessarily inferior to those of the Museum, this confusion will nonetheless tarnish the Museum's reputation and goodwill. One particular example is the social media post of a MOMACHA beverage infused with cannabidiol ("CBD"), a cannabis compound, and decorated with foam art in the shape of a marijuana leaf. Levitt Decl. Ex. L. One person commented in response that the drink looked like a "[g]reat excuse" to visit MoMA. Id. Other confused viewers may similarly hope that the Museum now sells CBD-infused beverages.
Another instance is the email the Museum received from an attorney representing an artist whose work was allegedly misappropriated by MOMACHA. Id., Ex. M. The attorney found the logos to be so similar that he needed the Museum's confirmation that the Museum was not affiliated with MOMACHA. Id. The Museum's reputation in the art industry would be significantly damaged if the public started to believe that the Museum misappropriates artists' work.
The confusion between the Museum and MOMACHA will take away the Museum's *383 "ability to control its reputation and the services offered under its name and mark." New York City Triathlon, 704 F.Supp.2d at 325.
This harm is not calculable and cannot be remedied by monetary damages. Therefore, absent injunctive relief, the Museum will suffer irreparable harm to its brand and goodwill.
III. Serious Questions on the Merits and Balance of Hardships
Because the Museum has shown a likelihood of success on the merits of its trademark infringement, unfair competition, and trademark dilution claims, the Museum has sufficiently demonstrated serious questions on the merits to make them fair grounds for litigation.
Without a preliminary injunction against MOMACHA, the Museum will suffer irreparable and unquantifiable harm to its reputation and goodwill, as discussed above. If MOMACHA is enjoined, MOMACHA's hardships will consist of the economic costs of changing its name and logo on its website, promotional materials, café items, and social media platforms. Although MOMACHA argues that this burden would be substantial (Defs.' Mem. at 20), this economic burden is quantifiable and compensable, unlike the harm that the Museum would suffer. See Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 8 (2d Cir. 1996) (noting that plaintiff's loss of consumer goodwill is unquantifiable and that defendant's "loss of profits" could be later compensated); Diesel Props S.R.L. v. Greystone Business Credit II LLC, No. 07-CV-9580 (HB), 2008 WL 594773, at *5 (S.D.N.Y. Mar. 5, 2008) (finding that plaintiffs' unquantifiable injuries outweigh defendants' quantifiable injuries). Furthermore, MOMACHA has already shown that it is willing and able to alter its logo and the appearance of its name when it changed its logo in April of 2018 (Cahan Decl. ¶ 11) and when its co-owner stated an intention to change MOMACHA's logo on a seasonal basis (Levitt Reply Decl. Ex. B). Accordingly, the balance of hardships tips in favor of the Museum.
Because the Museum has demonstrated irreparable harm, a likelihood of success on the merits, sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tilts in its favor, the Museum is entitled to a preliminary injunction.
CONCLUSION
The Museum's motion for a preliminary injunction (Dkt. No. 7) is granted and Defendants are enjoined from using, displaying, or promoting the MOMA or MOMACHA marks, and the https://momacha.com/ domain name, during the pendency of this action.
So ordered.